IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 21, 2025 Session

## STATE OF TENNESSEE v. MATTHEW COLE WELCH

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2021-CR-297    Larry J. Wallace, Judge**

_____

### No. M2023-01675-CCA-R3-CD

_____

Matthew Cole Welch, Defendant, was indicted for first degree murder and aggravated assault. After a jury trial, Defendant was found guilty of the lesser included offense of second degree murder and not guilty of aggravated assault. The trial court denied a motion for new trial and Defendant appealed, arguing that the evidence was not sufficient to support the conviction for second degree murder and that the trial court erred by refusing to charge the jury with a self-defense instruction. After a review, we conclude that the evidence was sufficient to sustain the conviction for second degree murder and that Defendant was not entitled to a self-defense instruction where the proof established that Defendant had a duty to retreat and failed to do so. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Matthew Cole Welch.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Ray Crouch, Jr., District Attorney General; and Talmadge Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Dickson County grand jury indicted Defendant for first degree murder and aggravated assault with a deadly weapon. The charges were based on an incident that occurred on May 6, 2021, during which Gary Baker, the victim, died.

At trial, the proof revealed that the victim and his girlfriend, Amanda Henry, lived at the victim's home on Glenn Baker Road in Dickson County. The home was next to a family cemetery. On the morning of May 6, 2021, Ms. Henry and the victim started to drive to work in the victim's truck when the truck "backfired" and malfunctioned. They called a wrecker service and the victim's brother-in-law. The wrecker service towed the truck to the residence, where the victim planned to "drop the gas tank and clean out the fuel lines." The victim asked Ms. Henry to "watch the surveillance camera to see if . . . anybody [was] there the night before . . . and put sugar in the tanks." When the victim returned home, he drained the gas tank into a glass jar and the bottom was full of what looked like sugar. The victim went back outside. Ms. Henry realized that he had not taken his diabetes medication so she planned to fix him something to eat so he could take his medication.

Around that same time, Dickson County Patrol Sergeant Christopher Lashlee escorted a funeral procession to the Baker Cemetery on Glenn Baker Road for a burial. As Sergeant Lashlee left the cemetery, he saw a black pickup truck pull into the victim's driveway.

There were approximately fifty to sixty people at the funeral, including Justin Dodson. During the funeral, he and other attendees could hear a "commotion" that "sounded like kids playing." "[A]ll of a sudden, . . . some lady c[a]me running up the road screaming for help." Mr. Dodson explained that the lady, later identified as Ms. Henry, yelled, "[T]hey're killing him." Several people from the funeral "went straight down the road [to the victim's home] and made contact with" Defendant, who was covered in blood. Mr. Dodson "walked around back" of the property and saw the victim's body. Mr. Dodson's uncle was trying to give CPR to the victim. Mr. Dodson relieved him. When he "pushed [the victim's] chest it went straight to his backbone." Mr. Dodson said it was like pushing on an "empty chest."

Deana Coakley was also at the funeral that day and heard Ms. Henry yelling for help. She walked toward the victim's home and made contact with Defendant who was "covered from literally head to toe in blood." She described Defendant's eyes as "evil." Ms. Coakley told Defendant that he may have killed a man.

Sergeant Lashlee received a call from dispatch "roughly [ten] to [fifteen] minutes" after leaving the funeral for an incident on Glenn Baker Road. The call came out as a "domestic" and "that possibly one person was unresponsive." When he arrived at the

- 2 -

victim's house, the scene was "chaos" with "people running all over the yard." He walked to the back of the house where he saw "a female down on the ground, a guy laying there, she had her head laying on his chest" and she was "screaming." Sergeant Lashlee pulled Ms. Henry off the victim and attempted to do chest compressions but it was "like pushing on  bag of broken glass." The victim's chest "never recovered from his back" and there was no pulse. The victim's "head was back, his eyes w[ere] open, mouth open, [and his] nostrils [weren't] moving."

Sergeant Lashlee detained Defendant in the driveway, placing handcuffs on his wrists. Defendant voluntarily informed Sergeant Lashlee that the victim was "trying to split his parents up" and that Defendant waited for Sergeant Lashlee to leave earlier so he would not intervene. Sergeant Lashlee sat Defendant next to a tree while securing the crime scene.

Detective Christopher Michael Stockman of the Dickson County Sheriff's Office responded to the scene as the on-duty detective. He was accompanied by Detective Jeff Lovell. The scene was "chaotic" when he arrived. He noticed several people dressed in "church" clothing walking around in both the front and back yard and the "ambulance service" on the scene. When he learned that the people milling about the crime scene were next door at a funeral when the incident took place, he treated them all as witnesses, collecting them into one area and asking them "who they were and what they saw and what their involvement was" in the incident. He notified his supervisor of the size of the scene and additional officers came to help interview witnesses and get statements.

According to Detective Stockman, the victim's body was near a well house at the rear of the property. There was "a lot" of blood on the well house which appeared to be "cast off" droplets. The wheels of Defendant's black Dodge Ram pickup truck had droplets of a reddish-brown substance on them appearing to be blood.

Detective Stockman described the "heavy steel bar" found in the back of Defendant's vehicle. He called it a "winching bar" which truckers use to "tighten down the heavy pay loads." The bar was three feet six inches long and had a reddish-brown substance consistent with blood on it. The end of the winching bar or ratchet bar was "kind of a U-shape." There was also a "Smith and Wesson M&P 9-millimeter semi-automatic pistol" in Defendant's truck. Defendant reported that he carried it from the scene and placed it in his truck after the altercation. Defendant's pistol, a Springfield XD .40-caliber semi-automatic pistol was in Defendant's vehicle and "was not involved in the incident at all." Detective Stockman also processed a hollow "jack handle" and "another handle, kind of like a paint roller, maybe a light-duty mop handle" or "broom handle" that may have been made of aluminum. Detective Stockman described the winching bar or rachet bar as "solid," "heavier than a baseball bat."

During his investigation, Detective Stockman discovered that there were security cameras at the residence. The video footage was played in its entirety for the jury. Then, Detective Stockman described what he witnessed in the video footage.

Detective Stockman noted that at 3:13 p.m., Defendant drove his pickup truck partially into the victim's driveway and exited the driver's side door. A police cruiser drove by the residence. The victim approached Defendant. Defendant reached into the bed of his truck and pulled out the ratchet bar. The victim raised his hand and quickly turned and ran toward the rear of the residence as Defendant chased him. The camera was fixed on the driveway. The men disappeared from the view of the camera.

A camera fixed on the rear of the residence captured the two parties fighting in the backyard area. The victim appeared to throw the first punch. The men exchanged punches for a short time on the back porch of the residence before Defendant knocked the victim over the railing of the back porch into the yard. The victim grabbed some type of pole or broom handle from the ground and the men squared off. Defendant continued to hold the ratchet bar in his hand. The victim and Defendant took turns swinging the pole and the ratchet bar at each other.

The men eventually fought behind a small well house at the rear of the property. Here, the view from the surveillance video was somewhat obstructed by the well house and a large branch from a tree. The victim was lying on his back while Defendant straddled him. Detective Stockman testified that Defendant's elbow moved back in a motion "consistent with throwing a punch . . . multiple times." Ms. Henry exited the house's back door holding the nine-millimeter pistol in one hand and her cell phone in the other. Ms. Henry ran to the back side of the well house, jumped on Defendant's back, and tried to pull him off the victim. Ms. Henry attempted multiple times to pull Defendant off the victim. Each time, Defendant pushed her away. A black object, presumably the gun, flew away from the parties and landed in the grass nearby. A white dog ran over to the object. Ms. Henry stepped away from the fight and retrieved the gun. Defendant remained on top of the victim, striking him. The victim's feet and legs "kick[ed] frantically." The victim's torso and head were not visible in the surveillance video.

Ms. Henry made her way back to the fight and tried to pull Defendant off the victim again as Defendant continued to strike the victim. Ms. Henry secured the pole and attempted to intervene in the fight again. Unsuccessful, she dropped the pole and used her phone. She appeared upset. At this point, the victim's movements slowed and Defendant and the victim were obscured by a tree branch and leaves.

Ms. Henry walked out of the frame of the video and reappeared shortly thereafter. She appeared to talk to Defendant, who stood near the victim with an object in his hand that looked consistent with the rachet bar. Ms. Henry walked away again. Defendant walked back toward the victim's body with a blunt object consistent with the ratchet bar in his hand. Detective Stockman described that Defendant moved the bar in a "windmill motion," to strike the victim at least three additional times. According to Detective Stockman, the "impression on [the victim's] body [wa]s visually consistent with that handle end of that rachet bar." Defendant then walked away toward the front of the house with a black object in his left hand and the ratchet bar in his right hand. The victim did not move.

Ms. Henry also captured a recording of the incident on her cell phone. During several portions of the cell phone video Defendant is seen straddling the victim. The Defendant had his hands around the victim's neck, choking him. The ratchet bar was lying across the torso of the victim.

Detective Stockman later interviewed Defendant at the hospital where he was being treated for a broken ankle and lacerations to his head. Defendant signed a *Miranda* waiver prior to the interview. During the interview, Defendant insisted that he was not armed and that the victim picked up the ratchet bar first. Defendant also stated that he never struck the victim with the metal bar but that he hit him a couple of times with his right hand or fist. Forensic examination revealed three DNA profiles on the ratchet bar: one from the victim, one from an unknown male, and one that could not be identified.

Ms. Henry testified that she was inside the residence when she heard the victim yell at her to "[g]et the gun." She looked outside and saw the victim "standing up fighting." Initially, she could not tell who the victim was fighting "because there was so much blood." She eventually recognized Defendant. Ms. Henry grabbed the gun and went back outside. When she got outside with the gun, Defendant was "on top [of the victim] choking him" behind the well house. Ms. Henry yelled and cussed at Defendant. The victim told her to "shoot him" because the victim could not breathe. Ms. Henry testified that she "put the gun to the side of [Defendant's] head, . . . pulled the trigger and it wouldn't go off." She "grabbed the first thing she [saw]" (a pole) and "started beating [Defendant] in the head with it." Defendant grabbed the gun, knocked her down, and knocked the gun and phone out of her hands. Ms. Henry stated that Defendant "leaned over and picked up the gun." Ms. Henry then "jumped" on Defendant's back and tried to get her arm "underneath his neck." Defendant told her to "stay the fu[**] out of it or [she] was next." Ms. Henry testified that Defendant told the victim that his "face will be the last face that you see, mother fu****]. You will never fu**] with my family again." On cross-examination, Ms. Henry admitted that none of Defendant's statements were captured on the audio or video recording from her phone.

- 5 -

Dr. Miguel Laboy, a medical examiner in Nashville, testified as an expert in forensic pathology. He performed an autopsy on the victim. He noted a few abrasions and lacerations on the victim's head and neck area, including two lacerations to the nose. The victim's nose was broken, consistent with an injury caused by impact. There was ecchymosis, or blood on the eyelid, caused by impact. The victim also had a hemorrhage on his neck.

Dr. Laboy noted various internal and external injuries to the victim's torso including lacerations and "multiple abrasions" to the arms, "an oblique fork-like pattern . . . contusion . . . at the lateral right chest . . . [with] a handle connecting that fork . . . measuring two inches in length and separate with center blanching." Dr. Laboy explained that blanching of the skin happens "when someone gets hit by an instrument and hit really hard." Part of the skin turns white or blanches, and the other area bruises, "making the pattern for the instrument" that was used for the strike on the skin of the individual. Dr. Laboy explained the size and shape of the bruising and blanching on the victim's chest:

> the center blanching measuring a quarter inch and the two forks are separated by a quarter inch - - one-and-a-quarter inch with two forks measuring three inches. So there was a separation between those two forks that were one-and-three-quarter inches in separation.

> 13 inches in length parallel oblique contusion with center blanching, measuring one-eighth by three-sixteenth extending to the chest. There was another separate - - there was 13 inches in length parallel oblique contusion with a center blanching. . . .

> So there . . . were two. There was one with the fork and there was one that it was like a rod.

Dr. Laboy opined that the injuries occurred from a striking motion rather than from someone pressing down on the victim's chest.

The victim had fractures on the right and left side of his chest with dry abrasions on both sides. There were three to five fractures to the front left ribs and three to seven more fractures to the anterior lateral left ribs. The victim had three to four fractures to the front right ribs and four to eleven fractures to the right lateral ribs. The fractures occurred before the victim's death. The victim's liver was nearly split in two; the spleen had lacerations to the hilum. There were 600 milliliters of blood in the victim's abdomen. Dr. Laboy opined that the ratchet bar had a "similar pattern" to the victim's injuries and that the victim died from "multiple blunt force injuries" due to "[h]omicide" "[a]ssaulted by other(s)."

On cross-examination, Dr. Laboy explained that the injury to the victim's liver alone was "lethal" and that "some people" could survive the victim's other injuries. Dr. Laboy could not rule out strangulation and noted that CPR could cause fractures "on the front side" of the ribs but "[n]ot on the sides and not on the back."

Defendant testified. Defendant claimed that he received a call from his wife that his father called and "said that that morning when he woke up he received a - - had a voice mail . . . from [the victim] stating that he had proof that he was cheating on his wife with [Ms. Henry] and [the victim] was going to kill him." The victim also threatened to call Defendant's mother to tell her about the alleged affair. Defendant went to the victim's house to "talk to him" about the "voicemail" and "the picture." Defendant explained that the victim's allegations were all a "mistake."

Defendant agreed that he pulled into the victim's driveway. He did not see anyone so he started to pull to the back of the house where he saw the victim working on a truck. The victim walked toward him, so Defendant turned off and got out of his truck. The victim approached him in "a very aggressive manner" and told him to "get off his property." Defendant told the victim he wanted to talk, and the victim threatened to get his gun and "kill" him. Defendant denied going to the victim's house with the intent to kill him but admitted that he had a gun in his truck.

Defendant described the fight that ensued. Defendant stated that he got the ratchet bar out of the back of his truck. He chased the victim to the back of the house, hoping that the victim would not be able to get to his gun. Defendant testified that he did not have time to leave when the victim threatened him. Defendant chased the victim onto the porch. The victim struck Defendant and they started fighting. Defendant explained that he passed the ratchet bar back and forth in between his hands and talked to the victim. Defendant told the victim that he "didn't want to fight" because it was all a "misunderstanding." Defendant testified that the victim picked up a pole and swung at him four times. Defendant admitted that he then "rushed" the victim and the victim dropped his pole and grabbed the ratchet bar. The men took swings at each other. Defendant stated that he and the victim ended up on the ground. Defendant admitted that he was on top of the victim and hit him with his fist. The victim fought back.

Defendant stated that Ms. Henry ran outside with a gun but that he was unaware that Ms. Henry put the gun to his head and pulled the trigger. Defendant claimed that he did not realize the gun was present until the victim got the gun in his possession. Defendant stated that he managed to grab the gun and tossed it away. Ms. Henry retrieved the gun. The victim regained possession of the gun and he and Defendant fought over it. Defendant managed to grab the gun again and throw it away. Ms. Henry picked up some nearby

object and struck Defendant in the head "probably half a dozen times." Ms. Henry also hit the victim a few times in the process. Ms. Henry jumped on Defendant's back and tried to "choke" him. Defendant testified at that point the victim had regained possession of the gun and Defendant was able to get his "left hand on the barrel of [the] firearm." Defendant admitted that he had his hands around the victim's neck but that he was only trying to "restrain" him. Defendant testified that he was not trying to kill or intentionally hurt the victim, he was only defending himself. Defendant stated that Ms. Henry ran off and he "pulled back" and got off the victim. Defendant picked up the ratchet bar. Defendant testified that up to this point he did not strike the victim with the ratchet bar, he "used it to help restrain [the victim]" by "pushing down on it in between" their bodies. Defendant claimed that the victim regained possession of the gun for a third time. Defendant testified that he "swung toward" the victim with the ratchet bar and "the gun fell and [he] picked it up and proceeded to walk away" toward his truck. Defendant testified that he turned around to see if the victim was going to chase him and when he realized the victim was not going to chase him, he walked "slowly" back to his truck while unloading the victim's weapon. Defendant testified that he was in survival mode, defending himself.

On cross-examination, Defendant denied striking the victim with the ratchet bar. He testified that the victim's liver was lacerated because he "fell on something," that his ribs were cracked from CPR, and that he got a gash on his nose from Ms. Henry striking him in the face with a pole.

Defendant admitted that it was obvious that the victim did not want to talk to him. Defendant admitted that he did not leave but instead chased the victim "[b]ecause he said he was going to kill [him] and get a gun."

At the conclusion of the jury trial, the jury acquitted Defendant of first degree murder and aggravated assault, finding Defendant guilty of the lesser included offense of second degree murder. The trial court sentenced Defendant to serve twenty-five years in incarceration.

Defendant filed a motion for new trial in which he argued that the evidence was insufficient to support his second degree murder conviction and that the trial court erred when it failed to instruct the jury on self-defense. The trial court denied the motion for new trial and Defendant timely appealed to this Court.

On appeal, he challenges both the sufficiency of the evidence and the trial court's decision to forego a self-defense charge.

*Analysis*

Initially, on appeal, Defendant argues that the evidence was insufficient to support the conviction for second degree murder. Specifically, he argues that the evidence "doesn't support the conclusion that he acted 'knowingly.'" Defendant argues that because he and the victim were engaged in "mutual combat" and he testified that he was "not aware that his conduct was reasonably certain to cause the death" of the victim, he could not be guilty of second degree murder. The State plainly argues that Defendant is "wrong."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id*.

To sustain a conviction for second degree murder, the State was required to prove beyond a reasonable doubt that Defendant unlawfully and knowingly killed the victim. T.C.A. §§ 39-13-201, 210(a)(1). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787 (quoting *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). Thus, a knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a

question of fact for the jury. *Inlow*, 52 S.W.3d at 104-105. "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Inlow*, 52 S.W.3d at 105 (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Here, the State introduced both cell phone video and surveillance video showing Defendant beating and strangling the victim. The victim's chest had several bruises that matched the shape of the ratchet bar. The medical examiner testified that the victim's injuries were caused by impact or striking rather than someone "pressing down" on the victim's body with the ratchet bar. The victim's injuries were extensive—with broken ribs on both sides of his body and a liver that was nearly split in two. The victim had over half a liter of blood in his body cavity. All these injuries to the victim are entirely consistent with Defendant's action so horrifying captured on the surveillance video exhibits. The victim's rib fractures were so severe that attempts at CPR were described as "pushing [o]n a bag of broken glass." There was ample evidence from which the jury could conclude that Defendant knowingly killed the victim.

*Jury Instructions*

Defendant argues that the trial court erred by refusing to charge the jury with self-defense. Specifically, Defendant claims the trial court erred when it determined that the self-defense instruction was not fairly raised by the proof. The State argues that the trial court properly denied the request for the instruction because the proof "unquestionably established that [Defendant] initiated the confrontation" and had "innumerable opportunities to abandon this encounter" and his "use of force" was "unreasonable." The State also insists that Defendant had a duty to retreat and failed to do so. In the alternative, the State argues that any error in refusing the instruction is harmless because no reasonable jury would have accepted Defendant's self-defense theory.

At the outset of our review of this issue, we note that Defendant claims in his brief that he "specifically requested that such instruction be given, arguing that the record supported a self-defense instruction." There is no discussion of the proposed jury instructions in the record on appeal. In fact, counsel for Defendant admitted at oral argument that the jury instruction discussion took place in chambers off the record and does not appear in the transcript on appeal. However, the State does not challenge Defendant's claim that he requested the instruction.

A defendant has a constitutional right to a "correct and complete charge of the law." *State v. Hollis*, 342 S.W.3d 43, 50 (Tenn. Crim. App. 2011); *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004). Consequently, trial courts are required, without request, "to give 'a complete charge of the law applicable to the facts of the case.'" *Hollis*, 342 S.W.3d at 50 (quoting *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998)). Because the constitutional right to trial by jury encompasses the right to a correct and complete charge of the law, the trial court's failure to fulfill its duty to give a complete charge of the law applicable to the facts of a case deprives the defendant of the constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The trial court must provide all instructions properly raised by the proof, regardless of the instructions requested by either party. *Dorantes*, 331 S.W.3d at 390. To evaluate a claim of error in the jury charge, this court reviews the charge in its entirety. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a grant or denial of a jury instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001); *State v. Jones*, No. E2022-01287-CCA-R3-CD, 2024 WL 1697775, at *12 (Tenn. Crim. App. Apr. 19, 2024) (citing *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)), *no perm. app. filed*.

The trial court's duty to provide complete and accurate instructions to the jury "extends to general defenses, such as self-defense, defense of another, or defense of a habitation," *Hawkins*, 406 S.W.3d at 129 (citation omitted), when the defense has been "fairly raised by the proof," T.C.A. § 39-11-203(c). The Tennessee Supreme Court has held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129; *see State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017). "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020) (citing *Hawkins*, 406 S.W.3d at 129). The trial court may infer "from the evidence as it is viewed in the light most favorable to the defendant" that the defendant acted out of a reasonable fear of imminent bodily harm, and "a defendant need not testify that he reasonably feared imminent bodily harm" to be afforded an instruction on self-defense. *Id.* at 904 (citations omitted). When self-defense has been fairly raised by the proof, "the trial court must submit the defense to the jury and

- 11 -

the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply." *Benson*, 600 S.W.3d at 903 (citation omitted).

Tennessee's self-defense statute provides that

(1) Notwithstanding § 39-17-1322,[1] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
(A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;
(B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and
(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1) & (2). Therefore, if a person is not in a place where he has the right to be or is engaged in unlawful conduct, the person has a duty to retreat before using deadly force. *State v. Taylor*, No. W2023-00115-CCA-R3-CD, 2021 WL 1697775, at *15 (Tenn. Crim. App. Apr. 19, 2024) (citing *Perrier*, 536 S.W.3d at 399). "The test of 'reasonable belief' places the emphasis on the defendant's reliance upon reasonable appearances rather than exposing the defendant to the peril of criminal liability where appearances were deceiving and no actual danger existed." *Id.*, Advisory Comm'n Cmts. Under the three-part test, "the defendant must reasonably believe he is threatened with imminent loss of life or serious bodily injury; the danger creating the belief must be real or honestly believed to be real at the time of the action; and the belief must be founded on reasonable grounds." *Id.*

In *Perrier*, our supreme court held that the trial court, as part of its threshold determination of whether to charge self-defense, should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction

---

[1] Tennessee Code Annotated section 39-17-1322 provides a defense to prosecution for a weapons violation "if a person possessed, displayed or employed a handgun in justifiable self-defense. . . ."

would not apply." 536 S.W.3d at 403. The *Perrier* court did not address whether the unlawful activity by the defendant in that case had to have a causal nexus to the defendant's perceived need to defend himself. *Id.* at 404. This Court subsequently held in *State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *26 (Tenn. Crim. App. Apr. 8, 2020), *rev'd on other grounds by State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense." The duty to retreat requires "that the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. *Perrier*, 536 S.W.3d at 397 (quoting *State v. Kennamore*, 604 S.W.2d 856, 859 (Tenn. 1980), *superseded by statute as stated in Perrier*, 536 S.W.3d 388). In other words, if a defendant has a duty to retreat and he failed to take steps to "avoid danger and avert the necessity of taking another's life," the defendant is not entitled to a self-defense instruction. *Id.*

Here, when viewed in a light most favorable to Defendant, Defendant's own testimony established that when Defendant exited his truck in the victim's driveway, the victim asked him to leave. Defendant became a trespasser on the victim's property at this point and, therefore, had a duty to retreat. Instead of returning to his truck and leaving the victim's property, he approached the victim. Defendant claims that the victim threatened to kill him but there is no audio accompanying the surveillance video and the victim's mouth is not visible in the surveillance video. Defendant testified that he did not have time to leave the victim's property. Defendant also testified that the victim owned a gun but admitted that he did not see the gun and did not know if the victim had the gun on his person.

Even taking Defendant's testimony as true, from our review of the surveillance video, Defendant had ample opportunity to leave. The victim was not visibly armed and did not advance toward Defendant. Instead of retreating, Defendant turned away from the victim, reached into his truck bed, grabbed the ratchet bar, and chased the victim to the rear of the property where the men engaged in mutual hand-to-hand combat. Defendant eventually overpowered the victim, straddled him, tried to strangle the victim with his hands, and ultimately beat the victim to death with his hands and the ratchet bar, nearly severing his liver in half and breaking many of the victim's ribs in the process. At one point during the encounter, while the victim was lying motionless on the ground, Defendant walked away from the victim momentarily, only to return and continue to literally beat the life out of the victim. The cell phone video shows Defendant clearly overpowering the victim. In our view, Defendant had multiple opportunities to retreat before he killed the victim. Reviewing the issue de novo, we conclude that Defendant had a duty to retreat and failed to take steps to "avoid danger and avert the necessity of taking another's life." *Id.* at 397. Consequently, Defendant was not entitled to a self-defense instruction. Accordingly, the trial court properly determined that the proof did not fairly raise the

- 13 -

defense of self-defense and correctly refused to instruct the jury.  Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


<u>s/Timothy L. Easter</u>
TIMOTHY L. EASTER, JUDGE